## HOPE NATURAL GAS CO. v. FEDERAL POWER COMMISSION et al.
### No. 4979.

Circuit Court of Appeals, Fourth Circuit.
Feb. 16, 1943.

Writ of Certiorari Granted May 17, 1943.

See 63 S.Ct. 1165, 87 L.Ed. ——.

William B. Cockley, of Cleveland, Ohio (Walter J. Milde, Theodore R. Colborn, and William A. Dougherty, all of Cleveland, Ohio, and Kemble White and Anthony F. McCue, both of Clarksburg, W. Va., on the brief), for petitioner.

Milford Springer, for Federal Power Commission, of Washington, D. C., and Spencer W. Reeder, Asst. Director of Law in Charge of Utility Controversies for City of Cleveland, of Cleveland, Ohio (Charles V. Shannon, Louis W. McKernan, and Howell Purdue, all of Washington, D. C., of counsel for Federal Power Commission; Thomas A. Burke, Jr., Director of Law, of Cleveland, Ohio, for City of Cleveland; Robert E. May, of Washington, D. C., and Alexander W. Parker and Joseph M. Winston, Jr., both of Richmond, Va., Attys. for City of Cleveland; A. F. O'Neil, Director of Law, and Clyde B. Macdonald, Asst. Director of Law, both of Akron, Ohio, for City of Akron, Attys. for City of Akron; Claude T. Reno, Atty. Gen. of Pennsylvania, and Harry M. Showalter, Counsel, and Samuel Graff Miller, Asst. Counsel, both of Harrisburg, Pa. for Pennsylvania Public Utility Commission, on the brief), for respondents.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is a petition by the Hope Natural Gas Company, hereafter referred to as "Hope", to review an order of the Federal Power Commission under the provisions of § 19(b) of the Natural Gas Act of June 21, 1938, 52 Stat. 831, 15 U.S.C.A. § 717r (b). Hope, a subsidiary corporation of the Standard Oil Company of New Jersey, was organized under the laws of West Virginia in the year 1898 and since that time has been engaged in the production, transportation and sale of natural gas. 80% of its sales are in interstate commerce and are subject to the jurisdiction of the Commission, but its interstate rates had not been regulated prior to this proceeding. In 1938 the cities of Cleveland and Akron, Ohio, filed complaints with the Commission alleging that the rates charged by Hope to the East Ohio Gas Company were unreasonable. The Pennsylvania Public Utility Commission filed complaints that the rates charged to the Peoples Natural Gas Company, the Fayette County Gas Company and the Manufacturers Light and Heat Company were also unreasonable. The Commission then instituted an investigation, on its own motion, into the reasonableness of all of Hope's interstate wholesale rates; and all of the proceedings relating to these rates were consolidated for hearing before the Commission.

On May 26, 1942, the Commission filed its opinion, findings and order holding that the rates charged since June 30, 1939 were unreasonable and establishing reduced rates for the future, the reduction ordered being approximately 20% in the rates charged the East Ohio Gas Company and the Peoples Natural Gas Company, both Standard Oil affiliates, to which by far the larger part of its sales were made. The rates to these companies were reduced from 36.5 and 35.5 cts. per m. c. f. to 29.5 and 28.5 cts. per m. c. f. respectively. Rates to two other companies, Fayette and Manufacturers, representing a small volume of the total sales, were reduced from 31.5 cts. to 28.5 cts.

The reductions in rates were ordered on the basis of findings made as to the value of Hope's property used in connection with its interstate business, the estimated operating expenses of the business and a rate of return upon investment of 6½%. Hope complains of the findings with respect to all of these matters but particu-

larly with respect to the valuation of the property adopted as the rate base. The valuation adopted by the Commission as the rate base was arrived at by taking the cost of the property as shown by the books of the company, corrected for bookkeeping errors but without allowance for price increases or consideration of capital items theretofore charged to expense, and deducting therefrom accrued depreciation based upon the estimated useful life of the property employed without reference to evidence as to its present condition based upon tests and observation. This method was applied to property taken over from other companies as well as to property originally purchased by Hope. The corrected book cost of the property was found to be $51,957,416, and depreciation was found to be $22,328,016 as of December 31, 1940, leaving a net investment of $29,629,400. To this was added $1,392,021 for net capital additions up until the effective date of the order, $566,105 for useful unoperated acreage and $2,125,000 for working capital. This gave a rate base of $33,712,526.

Hope introduced evidence to the effect that prior to 1923 labor costs in well drilling as well as the portion of the overhead expense of the company allocable thereto had been treated as expense in its bookkeeping entries, instead of being charged to capital account; that these items were a legitimate part of the cost of the property and present expenditures of like character were required to be so treated in the system of accounting prescribed by the Commission; that the items representing such expenditures prior to 1923 should be considered by the Commission as a part .of the legitimate cost of the property notwithstanding they had been charged . to expense; and that, when they were so considered, the cost of the property was shown to be $69,735,000, instead of $51,-957,416.

It was shown that the property used by Hope in its interstate business had been constructed over a forty year period during which there had been great fluctuations in prices and that prices at the time of hearing were at a far higher level than they were during the years preceding the first world war. The Public Utilities Commission of Ohio had found the reproduc-

tion cost new of the property, as of June 30, 1937, to be $100,257,000 and its present value after depreciation to be $66,166,-382.[1] Hope introduced an estimate of cost of reproduction new amounting to $97,-340,000 and a statement showing that the application of price trends to original cost would result in a figure of $105,101,000. This price trend statement showed that for property placed in public service between 1891 and 1916 at an original cost of $25,249,550 the price trends gave a figure of $52,451,675, whereas for property placed in service between 1917 and 1938 at a cost of $45,303,889 the trended value was only $53,788,551. Hope contended that the allowance for depreciation should have been based on the actual condition of the property as determined by observation with allowance for obsolescence; and that the depreciation allowance resulting was 34.51%. Applying this rate of depreciation to the estimate of the cost of reproduction new of its property, it arrived at a rate base as of December 31, 1938, of $66,-360,000.

The Commission found that Hope's estimates of reproduction cost and trended original cost were without probative value and disregarded them, as it did also Hope's evidence as to the observed condition of the property. No consideration was given to the change in price levels which was shown by the estimates and which, even in their absence, might have been noticed as matters of general and common knowledge.

The vital questions in the case relate to the determination of the rate base; and, in view of the low rate of return allowed and the consequent lack of margin to take care of error in the base, the rates allowed must be condemned as unreasonable and confiscatory because of the following errors with respect to the valuation of the property constituting the base: (1) the Commission did not find the present fair value of the property and took no account of the change of price levels in determining the rate base; (2) the Commission ignored items of well drilling costs and overhead, aggregating in excess of $17,000,-000, which entered into the original cost of the property, basing this action on the fact that, under the system of accounting that prevailed at the time, these items had been charged on the company's books to ex-

---

[1] East Ohio Gas Co. v. City of Cleveland, 27 P.U.R.,N.S., 387, 417. See also table 6 appended to report of Commission in that case but not published in Public Utilities Reports.

pense; and (3) the Commission ignored evidence as to the present condition of the property and computed accrued depreciation theoretically on the straight-line service-life method. We shall discuss these matters separately in the order named.

## Present Value.

The report of the Commission shows, not only that it gave no consideration to rise in price levels in determining the amount of the rate base, but also that it made no attempt to ascertain the present fair value of the property involved. It adopted as the rate base the original cost of the property as shown by the company's books, adjusted to correct bookkeeping errors and depreciated as above indicated. It took the view that this depreciated book cost could properly be taken as the base without reference to whether it did or did not represent the present fair value of the property saying: "With the decline in favor of 'fair value' as the only mode of public utility rate regulation, its keystone, reproduction cost, crumbles. Bona fide investment figures now become all important in the regulation of rates".

██ Much is to be said in favor of the prudent investment theory of determining the rate base. It is simple; it is expeditious; and it avoids the necessity of resorting to unsatisfactory estimates of the cost of reconstructing a system that no one would now reconstruct. Where there has been no great change in price levels, prudent investment cost can be taken, subject to appropriate depreciation, as representing the present fair value of the property for rate making purposes. And even where there have been changes in price levels, it can be thus taken, we think, if such basis has been established by legislative authority prior to the dedication of the property to public use or if statutory provision has been made for valuation of the property on the basis of present fair value and the use of prudent investment cost in the future, and the property has been so valued. See Bauer & Gold, "Public Utility Valuation for Purposes of Rate Control" (1934) p. 424 et seq. In the absence of such legislation and valuation, however, such depreciated original cost cannot be taken as the rate base where there has been a change in the level of prices and the investment in the utility has been made while the "fair value" theory was prevailing. As is well said in Bauer & Gold, supra, pp. 424 and 425:

"If the rights and obligations of future investors are exactly set forth, and if systematic provisions are made for enforcement, they would doubtless be held subject to the conditions. If they furnish capital under a policy explicitly enunciated, they can have no grounds for claiming that they are deprived of 'due process.' For all future dealing, legislatures are probably free to establish any policy that seems desirable from the public standpoint. They are probably not required to continue the indefinite basis of dealing with all future investments merely because no definite policies and standards were established in the past.

"The situation, however, is different with regard to properties constructed or installed in the past. As to these, the funds were contributed under the general law of the land, without exact limitations upon the return. Except for the undefined rule that they were entitled to fair return on fair value, they were not placed under precise and systematic control. If prices increased after the date of investment, the companies have been entitled to have the advance recognized in new valuations. This right probably cannot be abrogated on grounds of public policy unless a proper equivalent is provided. While the right itself is vague and variable, it nevertheless exists and presumably cannot be modified except through replacement by a definite substitute that is fair and reasonable."

And the same authors, in dealing with the method of establishing a fixed rate base "through outright adoption of investment as rate base, starting with existing book value of the properties on the basis of present accounting methods", point out as an objection to it that fluctuation in prices may not be ignored. At pp. 432 and 433 they say:

"Besides doubts as to reliability of present book figures, the proposal also raises the question as to how the shift in price level should now be treated in the light of fallen prices. Under the law of the land there is no doubt but that the public is entitled to have fair value determined according to present and prospective prices. If 'fair value' does not rest exclusively upon reproduction cost levels, it certainly must be determined nevertheless largely with consideration to the price changes

that have taken place. Properties installed during the pre-1929 era back to about 1914, would have to be repriced on the basis of the new level. Furthermore, the public is entitled also to have considered the advances in technology which resulted in reduced unit cost of construction. These adjustments would be entirely ignored in outright adoption of book value as the starting point of a fixed rate base.

"These are matters of important consideration in planning and establishing the new policy of control. For the future, the purpose is, of course, to eliminate the factor of price fluctuations from consideration in the rate base. In the past, however, under present law, this has been the dominant element in valuation and primarily responsible for the unsatisfactory conditions of regulation. *But if a fixed rate base is to be established, the question should not be ignored as to how the price changes that have taken place should be provided for in the adoption of initial rate base.*" (Italics supplied.)

■■ There is nothing in the Natural Gas Act, 15 U.S.C.A. § 717 et seq., which justifies the thought that Congress was providing therein for the exclusive use of the prudent investment theory of property valuation. No "fixed rate base" as advocated by Bauer & Gold is referred to, and no provision is made for initial valuation of properties with addition of subsequent investment costs as the base. On the contrary, the usual general provision for "just and reasonable" rates is made in sec. 4(a) of the Act; and, as we shall point out hereafter, it is well settled in existing law that, to be considered "just and reasonable", rates must be such as to yield a fair return upon the fair value of the property used in rendering the service. In sec. 6(a) provision is made for the Commission to ascertain the actual legitimate cost of the property and the depreciation therein, "and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation *and the fair value of such property*". (Italics supplied.)

The pertinent sections of the Natural Gas Act, 52 Stat. 821, 15 U.S.C.A. §§ 717c (a), 717d(a), 717e(a) (b), are as follows:

"Sec. 4. (a) All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commis-

sion, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful."

"Sec. 5. (a) Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: Provided, however, That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates."

"Sec. 6. (a) The Commission may investigate and ascertain the actual legitimate cost of the property of every natural-gas company, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation and the fair value of such property.

"(b) Every natural-gas company upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction."

■ It was clearly the intention of Congress that under these sections the Commission might investigate and ascertain cost and depreciation of properties of natural gas companies, irrespective of whether a rate inquiry was involved or not, and that, where rate making was involved, the investigation might extend to other

facts which bear on cost or depreciation and the fair value of the property. Instead of prescribing a change in the method of determining the rate base, it is clear that the statute contemplates that the base should be determined in accordance with existing legal rules; and it is basic in these rules that the present fair value of the property be ascertained so that rates may be established which will afford a fair return upon fair value and so will not be confiscatory in the constitutional sense. This we understand to be the construction given the Act in the recent case of Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 585, 586, 62 S.Ct. 736, 742, 86 L.Ed. 1037, where the Court, speaking through Mr. Chief Justice Stone, said:

"By long standing usage in the field of rate regulation the 'lowest reasonable rate' is one which is not confiscatory in the constitutional sense. Los Angeles Gas Co. v. Railroad Commission, 289 U.S. 287, 305, 53 S.Ct. 637, 643, 77 L.Ed. 1180; Railroad Commission v. Pacific Gas Co., supra, 302 U.S. [388], pages 394, 395, 58 S.Ct. [334], page 338, 82 L.Ed. 319; Denver [Union] Stock Yard Co. v. United States, 304 U.S. 470, 475, 58 S.Ct. 990, 994, 82 L.Ed. 1469. Assuming that there is a zone of reasonableness within which the Commission is free to fix a rate varying in amount and higher than a confiscatory rate, see Banton v. Belt Line Ry. Corp., 268 U.S. 413, 422, 423, 45 S.Ct. 534, 537, 69 L.Ed. 1020; Columbus Gas Co. v. Commission, 292 U.S. 398, 414, 54 S.Ct. 763, 78 L.Ed. 1327, 91 A.L.R. 1403; Denver [Union] Stock Yard Co. v. United States, supra, 304 U.S. page 483, 58 S.Ct. [990], page 998, 82 L.Ed. 1469, the Commission is also free under § 5(a) to decrease any rate which is not the 'lowest reasonable rate.' *It follows that the Congressional standard prescribed by this statute coincides with that of the Constitution,* and that the courts are without authority under the statute to set aside as too low any 'reasonable rate' adopted by the Commission which is consistent with constitutional requirements.

"The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances." (Italics supplied.)

The conception that, not to be confiscatory, rates must yield a fair return upon the present fair value of the property has long been well settled by Supreme Court decisions. Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77, established the principle that rates of public utilities were subject to regulation by the state. Mr. Chief Justice Waite who wrote the opinion in that case laid down the limitation, however, in Stone v. Farmers' Loan & Trust Co., 116 U.S. 307, 331, 6 S.Ct. 334, 345, 388, 1191, 29 L.Ed. 636, that the power could not be exercised to confiscate the property invested in the utility, saying, "From what has thus been said, it is not to be inferred that this power of limitation or regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretense of regulating fares and freights the state cannot require a railroad corporation to carry persons or property without reward; neither can it do that which in law amounts to a taking of private property for public use without just compensation, or without due process of law." Regulation of rates of public utilities differs from ordinary price fixing such as was involved in Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469, in that, in the case of a public utility, property has been dedicated to the use of the public and the state can require its continued operation, whereas in the case of ordinary property subject to price regulation the owner is not required to sell. By dedicating his property to public use the owner impliedly consents to regulation of its rates by the state; but this consent is conditioned upon his property's not being taken from him under the guise of regulation, i. e. that the rates fixed allow him a fair return upon its fair value. The rule is thus stated in the Minnesota Rate Cases, Simpson v. Shepard, 230 U.S. 352, 434, 33 S.Ct. 729, 754, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1916A, 18:

"The basis of calculation is the 'fair value of the property' used for the convenience of the public. Smyth v. Ames, [supra] 169 U.S. [466], page 546, 18 S. Ct. 418, 42 L.Ed. [819], 849. Or, as it was put in San Diego Land & Town Co. v. National City [supra] 174 U.S. [739], page 757, 19 S.Ct. 804, 43 L.Ed. [1154], 1161:

'What the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public.'"

In Los Angeles Gas Co. v. R. R. Com'n, 289 U.S. 287, 305, 53 S.Ct. 637, 644, 77 L. Ed. 1180, cited with approval by Mr. Chief Justice Stone in Federal Power Commission v. Natural Gas Pipeline Co., supra, Mr. Chief Justice Hughes laid down the criterion in the following language:

"As the property remains in the ownership of the complainant, the question is whether the complainant has been deprived of a fair return for the service rendered to the public in the use of the property. This court has repeatedly held that the basis of calculation is the fair value of the property, that is, that what the complainant is entitled to demand, in order that it may have 'just compensation' is *a fair return upon the reasonable value of the property at the time it is being used for the public.'* In determining that basis, the criteria at hand for ascertaining market value, or what is called exchange value, are not commonly available. The property is not ordinarily the subject of barter and sale and, when rates themselves are in dispute, earnings produced by rates do not afford a standard for decision. The value of the property, or rate base, must be determined under these inescapable limitations. And mindful of its distinctive function in the enforcement of constitutional rights, the court has refused to be bound by any artificial rule or formula which changed conditions might upset. We have said that the judicial ascertainment of value for the purpose of deciding whether rates are confiscatory 'is not 'a matter of formulas, but there must be a reasonable judgment, having its basis in a proper consideration of all relevant facts.' Minnesota Rate Cases; 230 U.S. 352, 434, 33 S.Ct. 729, 754, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas. 1916A, 18; Georgia Railway & Power Co. v. Railroad Commission, 262 U.S. 625, 630, 43 S.Ct. 680, 67 L.Ed. 1144; Bluefield Water Works Co. v. Public Service Commission, 262 U.S. 679, 690, 43 S.Ct. 675, 67 L. Ed. 1176." (Italics supplied).

Under this rule, in the absence of some such statutory provision as indicated at the beginning of this discussion, the determination of fair present value as the rate base is inescapable if there is to be a "fair return upon fair value". What has declined in favor is not, as the Commission thought, the "doctrine" of fair value, but the cumbersome and misleading reproduction cost theory as a means of determining it. Property has no value except present value. Past value exists only in memory or in history, future value only in estimate or expectation. It is the property presently existing which belongs to the utility and is used by the public. It is that property which is depreciated through use and which is gradually being sold through depreciation to the public. And it is the value of that property as used which must be considered in fixing rates that will reimburse the company for its partial sale through use and provide an adequate return upon investment. If a piece of property which cost $10,000 originally but can only be replaced at a cost of $20,000, and is worth $20,000 to the company in carrying on its business, be treated as being worth only $10,000 for the purpose of depreciation and return, the company is deprived of property by the rate in exactly the same way as a merchant who is required to sell for $5 a pair of $10 shoes. It must not be forgotten that it is the property owned by the utility, and not the cash invested by stockholders in its stock, that is devoted to public use; that this property is worn out in furnishing the service which the public receives and which the utility is bound to render; and that, unless the utility receives a rate sufficient to make necessary replacements at current prices with a fair return upon the present fair value of its investment, its property is being taken from it and given to its customers.

The task of arriving at fair present value is a difficult one and necessarily involves exercise of judgment of a high order. The problem is easily over-simplified by those seeking to maintain a thesis. In times of falling prices, those representing the utilities emphasize the importance of original investment cost, while those seeking lower rates point out the folly of fixing rates on the basis of a value which no longer exists and demand that reproduction cost be taken as the criterion. In periods of rising prices, the position of the advocates is reversed. To fix value on original investment cost without reference to change in price levels may easily lead to absurdly high or low valuations, with an undue burden on the public in the case of falling prices and with such confiscation of the property of the utility in the case of

rising prices as may result in 'its ruin. It is idle to argue that the utility should not complain if it recoups through its rates the original investment in its equipment. The law requires that the business of the utility go on. Its equipment must be replaced as it is worn out. And, if the rates allowed are not sufficient to make replacements at current prices, bankruptcy is inevitable. On the other hand, estimates of reproduction cost do not provide a satisfactory method of arriving at value. Aside from the temptation of expert witnesses to over estimate costs in a theoretical reproduction, the fact is that nobody could or would build the utility again as it has grown up through the years. While reproduction cost may be considered, therefore, it is not ordinarily, standing alone, a fair criterion of valuation.

■ The duty of the Commission to determine the present fair value of the property and to give consideration to all factors entering into that value is thus stated by Mr. Chief Justice Hughes in the case of Los Angeles Gas Co. v. R. R. Com'n, supra, 289 U.S. at page 306, 53 S. Ct. at page 644, 77 L.Ed. 1180:

"The actual cost of the property—the investment the owners have made—is a relevant fact. Smyth v. Ames, 169 U.S. 466, 547, 18 S.Ct. 418, 42 L.Ed. 819. But, while cost must be considered, the Court has held that it is not an exclusive or final test. The public have not underwritten the investment. The property, on any admissible standard of present value, may be worth more or less than it actually cost. The time and circumstances of the outlay, and the effect of altered conditions, demand consideration. Even when cost is revised so as to reflect what may be deemed to have been invested prudently and in good faith, the investment may embrace property no longer used and useful for the public. This is strikingly illustrated in the present case where the company has a large gas manufacturing plant which, in view of the supply of natural gas, has not been used for several years and is not likely to be used for many years to come,· if at all. But no one would question that the reasonable cost of an efficient public utility system 'is good evidence of its value at the time of construction.' We have said that 'such actual cost will continue fairly well to measure the amount to be attributed to the physical elements of the property so long as there is no change in the level of applicable prices'. McCardle v. Indianapolis Water Co., 272 U.S. 400, 411, 47 S. Ct. 144, 148, 71 L.Ed. 316. And, when such a change in the price level has occurred, actual experience in the construction and development of the property, especially experience in a recent period, may be an important check upon extravagant estimates.

"This court has further declared that, in order to determine present value, the cost of reproducing the property is a relevant fact which should have appropriate consideration. Southwestern Bell Telephone Co. v. Public Service Commission, 262 U. S. 276, 287, 288, 43 S.Ct. 544, 546, 67 L.Ed. 981, 31 A.L.R. 807; Bluefield Water Works v. Public Service Commission, supra; Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 156, 45 S.Ct. 465, 69 L.Ed. 890; McCardle v. Indianapolis Water Co., supra, 272 U.S. page 410, 47 S.Ct. 144, 71 L.Ed. 316. In Southwestern Bell Telephone Company v. Public Service Commission, supra, this court said that 'it is impossible to ascertain what will amount to a fair return upon properties devoted to public sevice, without giving consideration to the cost of labor, supplies, etc., at the time the investigation is made. An honest and intelligent forecast of probable future values, made upon a view of all the relevant circumstances, is essential. If the highly important element of present costs is wholly disregarded, such a forecast becomes impossible.' See St. Louis & O'-Fallon Railway Co. v. United States, 279 U.S. 461, 485, 49 S.Ct. 384, 73 L.Ed. 798. But, again, the court has not decided that the cost of reproduction furnishes an exclusive test. See Smyth v. Ames, supra; Minnesota Rate Cases, supra; Georgia Railway & Power Co. v. Railroad Commission, supra. We have emphasized the danger in resting conclusions upon estimates of a conjectural character. We said, in Minnesota Rate cases, supra, 230 U.S. page 452, 33 S.Ct. 729, 761, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1916A, 18: 'The cost-of-reproduction method is of service in ascertaining the present value of the plant, when it is reasonably applied and when the cost of reproducing the property may be ascertained with a proper degree of certainty. But it does not justify the acceptance of results which depend upon mere conjecture. It is fundamental that the judicial power to declare legislative action invalid upon constitutional

grounds is to be exercised only in clear cases. The constitutional invalidity must be manifest, and if it rests upon disputed questions of fact, the invalidating facts must be proved. And this is true of asserted value as of other facts.' The weight to be given to actual cost, to historical cost, and to cost of reproduction new, is to be determined in the light of the facts of the particular case. McCardle v. Indianapolis Water Co., supra."

▮▮▮ In the pending case, original investment cost cannot be taken alone as a measure of the present fair value of the property because of the great changes in the prices of labor and materials which have occurred over the more than forty years during which the investments in the property have been made. These changes are matters of general and common knowledge and are shown by many publications, statistical reports and other documents readily available. That such changes have occurred is shown also by the evidence offered before the Commission. It is true that the statements of reproduction cost and trended original cost fail to allow for the increased productivity of labor and fail to take account of other pertinent factors; and the Commission, we think, was justified in refusing to accept the conclusions therein contained. But this does not mean that the Commission could ignore the change in price levels which was clearly established and was matter of general and common knowledge otherwise. The Commission's staff prepared statements showing that the conclusions of Hope's reproduction cost and trended cost statements should not be accepted. They could doubtless have furnished estimates as to the proper effect to be accorded price trends in the correct valuation of the property. At all events, the Commission should have given consideration to the matter; and, if of opinion that investment cost was a true measure of the present value of the property notwithstanding increase in prices, it should have found this as a fact. It could not absolutely ignore the fact of increased price levels in determination of present fair value. This is clearly laid down by Mr. Chief Justice Hughes in Los Angeles Gas Co. v. R. R. Com'n, supra, and is firmly established by repeated decisions of the Supreme Court.

In the recent case of McCart v. Indianapolis Water Co., 302 U.S. 419, 58 S. Ct. 324, 82 L.Ed. 336, the Supreme Court affirmed a holding of the Circuit Court of Appeals that a decision of a district court should be reversed and the case remanded for a redetermination of value because of an upward trend in prices of which the Circuit Court of Appeals took judicial notice and which the District Court had not taken into account.

In West v. C. & P. Tel. Co., 295 U.S. 662, 55 S.Ct. 894, 897, 79 L.Ed. 1640, the Supreme Court, in condemning the use of certain price trend indices in connection with cost as establishing present value, said:

"The established principle is that as the due process clauses (Amendments 5 and 14) safeguard private property against a taking for public use without just compensation, neither Nation nor State may require the use of privately owned property without just compensation. When the property itself is taken by the exertion of the power of eminent domain, just compensation is its value at the time of the taking. So, where by legislation prescribing rates or charges the use of the property is taken, just compensation assured by these constitutional provisions is a reasonable rate of return upon that value. To an extent value must be a matter of sound judgment, involving fact data. To substitute for such factors as historical cost and cost of reproduction, a 'translator' of dollar value obtained by the use of price trend indices, serves only to confuse the problem and to increase its difficulty, and may well lead to results anything but accurate and fair. This is not to suggest that price trends are to be disregarded; quite the contrary is true. *And evidence of such trends is to be considered with all other relevant factors.* St. Louis & O'Fallon Ry. Co. v. United States, 279 U.S. 461, 485, 49 S.Ct. 384, 73 L.Ed. 798; Clark's Ferry Bridge Co. v. Public Service Comm'n, 291 U.S. 227, 236, 54 S.Ct. 427, 78 L.Ed. 767." (Italics supplied.)

In that case, the District Court, departing from the method employed by the Maryland Commission, adopted as the rate base cost less depreciation reserve. This method the court likewise condemned, saying: "The opinion in essence consists of the conclusion that, all the circumstances considered, it will be fair to appraise the property at cost less depreciation reserve. This rough and ready approximation of value is as arbitrary as that of the com-

mission, for it is unsupported by findings based upon evidence."

In McCardle v. Indianapolis Water Co., 272 U.S. 400, 411, 47 S.Ct. 144, 148, 71 L. Ed. 316, the Court, in condemning a valuation which did not take account of a change in the level of prices, said:

"Undoubtedly, the reasonable cost of a system of waterworks, well-planned and efficient for the public service, is good evidence of its value at the time of construction. And such actual cost will continue fairly well to measure the amount to be attributed to the physical elements of the property so long as there is no change in the level of applicable prices. And, as indicated by the report of the commission, it is true that, if the tendency or trend of prices is not definitely upward or downward and it does not appear probable that there will be a substantial change of prices, then the present value of lands plus the present cost of constructing the plant, less depreciation, if any, is a fair measure of the value of the physical elements of the property. The validity of the rates in question depends on property value January 1, 1924, and for a reasonable time following. While the values of such properties do not vary with frequent minor fluctuations in the prices of material and labor required to produce them, they are affected by and generally follow the relatively permanent levels and trends of such prices."

In State of Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Commission, 262 U.S. 276, 287, 43 S.Ct. 544, 546, 67 L.Ed. 981, 31 A.L.R. 807, the Court said:

"Obviously, the commission undertook to value the property without according any weight to the greatly enhanced costs of material, labor, supplies, etc., over those prevailing in 1913, 1914, and 1916. As matter of common knowledge, these increases were large. Competent witnesses estimated them as 45 to 50 per centum.

\* \* \* \* \*

"It is impossible to ascertain what will amount to a fair return upon properties devoted to public service, without giving consideration to the cost of labor, supplies, etc., at the time the investigation is made. An honest and intelligent forecast of probable future values, made upon a view of all the relevant circumstances, is essential. If the highly important element of present costs is wholly disregarded, such a forecast becomes impossible. Estimates for tomorrow cannot ignore prices of today."

In Bluefield Water Works & Imp. Co. v. Public Service Comm., 262 U.S. 679, 689, 43 S.Ct. 675, 677, 67 L.Ed. 1176, the Court said: "The record clearly shows that the commission, in arriving at its final figure, did not accord proper, if any, weight to the greatly enhanced costs of construction in 1920 over those prevailing about 1915 and before the war, as established by uncontradicted evidence; and the company's detailed estimated cost of reproduction new, less depreciation, at 1920 prices, appears to have been wholly disregarded. This was erroneous." See also Driscoll v. Edison Lt. & Power Co., 307 U.S. 104, 118-119, 59 S.Ct. 715, 83 L.Ed. 1134.

The case of R. R. Commission v. Pacific Gas & Electric Company, 302 U.S. 388, 58 S.Ct. 334, 82 L.Ed. 319, is not to the contrary; for it appears in that case that the Commission there received and considered evidence of cost of reproduction and other evidence bearing upon the value of the property. Here no consideration whatever was given to change in price levels and its effect on value, and investment cost less depreciation is frankly taken as the rate base without any pretense that it represents value. As stated above, we find no fault in the action of the Commission in rejecting the estimates of reproduction cost and trended value; and we have considered whether we might not sustain the rate base on the theory that, upon the rejection of these estimates, the only evidence of value before the Commission was the evidence of investment cost. This, however, would be to close our eyes to the rise in price levels which are so great and far reaching that we must take judicial notice of them, and which are shown by the evidence to that effect included in the estimates. It would be to close our eyes also to the fact that the Commission has proceeded upon an erroneous theory of law in arriving at the rate base.

And there is nothing to the contrary in Federal Power Commission v. Natural Gas Pipeline Co., supra. It is true that in that case the court said that the Constitution "does not bind rate-making bodies to the service of any single formula or combination of formulas"; but substantially the same thing had been said long before in the Minnesota Rate cases. See 230 U.S. at page 434, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1916A, 18.

It had been repeated by Mr. Chief Justice Hughes in the opinion in Los Angeles Gas Co. v. R. R. Com'n, supra, and appears in the opinions in a number of other cases. The concurring opinion does interpret the opinion of the court as holding that the Commission may now adopt prudent investment as a rate base and reject all other formulas. We think, however, in view of the expression in the majority opinion quoted above, to the effect that the rate must be one which is not confiscatory, that, in judging whether the rate is confiscatory or not, historical cost under the prudent investment theory can be adopted as the rate base without reference to other matters affecting value only where it can reasonably be found to represent present fair value. Rate making bodies may make pragmatic adjustments "within the ambit of their statutory authority", but the ambit of their authority does not extend to action which is confiscatory in character. Original cost or historical cost as shown by the books is evidence of value in all cases and can be adopted as representing present fair value where under all the circumstances of the case it is not unreasonable to do so. But, in the light of the cases cited above, it is unreasonable to adopt it as representing such value when, as in the case at bar, there has been a great change in price levels.

To sum up on this branch of the case: The Natural Gas Act makes no provision for a "fixed rate base" or the exclusive use of prudent investment in determining the base. Not to be confiscatory, rates must allow a fair return upon the present fair value of the property. To determine this fair return upon present fair value, the Commission must find what the present fair value of the property is. The Commission is not confined to any one formula or group of formulas in determining present fair value, but must determine it in the light of all the circumstances of the case. Prudent investment cost with proper allowance for depreciation may in some cases provide, without consideration of anything else, a proper measure of present fair value, but not where following investment there has been a decided change in price levels. Such a change in price levels is shown by the evidence in this case and besides is a matter of such general and common knowledge that the court must take judicial notice of it. The adoption by the Commission of investment cost less depreciation as the rate base, therefore, is arbitrary and unreasonable, does not conform to statutory requirements and is violative of the due process clause of the 5th Amendment to the Constitution.

### Exclusion of Well Drilling Costs.

Prior to 1923 Hope and the companies from which it acquired properties charged on their books to expense the labor cost directly involved in drilling new wells and the portion of overhead expense properly allocable thereto. The items so charged amounted to approximately $17,-000,000, which, of course, does not take account of depreciation or depletion. Under the system of uniform accounts now prescribed by the Commission, such items are charged, as they should be, to capital investment; and such items since 1923 have been so charged by Hope because of a requirement to that effect in the West Virginia law. In valuing Hope's property, however, the Commission refused to consider in the valuation these items aggregating $17,000,000 (reduced by depletion and depreciation to around $4,000,000), because they had originally been charged on the books to expense, although they clearly represented investment in existing property.

If present fair value be taken as the criterion in determining the rate base, in accordance with our holding as to the legal and constitutional requirements in the premises, there can be no question but that the present fair value of these wells and all elements that have entered into that value must be given consideration, whatever be the method of accounting that Hope may have followed in entering the investment on its books. And, even if the prudent investment theory be adopted for determining the rate base, we see no valid reason for excluding these items from the investment. The wells are existing property used by the utility in its service to the public. The items entered into their cost just as truly as if they had been charged to capital account. No question is raised as to the investment being prudent; and the method of accounting employed with respect to the items cannot change the fact that they represent investment by the company in property which it uses in rendering the service for which rates are prescribed. "Original cost", says Mr. Justice Brandeis in a note to his celebrated dissenting opinion in State of Missouri ex rel. Southwest-

ern Bell Telephone Co. v. Public Service Commission 262 U.S. 276, 295, 43 S.Ct. 544, 549, 67 L.Ed. 981, 31 A.L.R. 807, "is the amount actually paid to establish the utility". In this note, which shows very clearly that under the prudent investment theory, historical cost, which is prudent investment, must take account of what the property would have cost on the basis of what normally should have been paid for it. He says:

"Original cost is the amount actually paid to establish the utility. The amount is ascertained, where possible, by inspection of books and vouchers, and by other direct evidence. If this class of evidence is not complete, it may be necessary to supplement it by evidence as to what was probably paid for some items, by showing prices prevailing for work and materials at the time the same were supplied. But the evidence of these prices is merely circumstantial, or corroborative, evidence of the amount actually paid. In determining actual cost, whatever the evidence, there is no attempt to determine whether the expenditure was wise or foolish, or whether it was useful or wasteful. Historical cost, on the other hand, is the amount which normally should have been paid for all the property which is usefully devoted to the public service. It is, in effect, what is termed the prudent investment. In enterprises efficiently launched and developed, historical cost and original cost would practically coincide both in items included and in amounts paid; that is, the subjects of expenditure would coincide, and the cost at prices prevailing at the time of installation would substantially coincide with the actual cost."

The question arose before the Interstate Commerce Commission in connection with the valuation of the New York, Philadelphia and Norfolk R. Co., 97 I.C.C. 273, 279, where the Commission said:

"The question to be determined is whether the voluntary act of the carrier in charging only a portion of the cost of road and equipment to its investment account estops it from thereafter claiming as investment the additional cost not charged out properly in the first instance. Under the mandate of the statute we are required to find the value of the property of the carrier. The investment account, when properly stated, constitutes evidence of value to which consideration must be given. In this case the investment in property being de-

voted to carrier purposes on valuation date is incompletely stated in that costs incurred therefor were entered as charges to income. If our present system of accounting had been in force when the entries were made the investment account would have included the amount here claimed as proper.

"In previous cases instances have been found where the investment account has been incorrectly kept, capital expenditures being recorded in operating expenses or as charges to income. In order to obtain an accurate statement of investment it has been necessary in such instances to reconstruct the accounts. Here the carrier has presented evidence of costs that have not been included in our restated investment figure, although the property was found in ownership and use on date of valuation, was inventoried and is included in our estimates of cost of reproduction new and less depreciation. The evidence is persuasive that the investment figure should be increased by the amount of $733,846.13 and our tentative report will be revised accordingly."

It is argued that the items charged to expense entered into the rates paid by the customers of the company, and that the company may not treat as capital investment the expenditures for property thus paid for by its customers. The answer, of course, is that the customers paid for gas, not for the construction of wells, and that neither the cost of the wells nor the company's ownership thereof is affected by the fact that it may have paid for them with the proceeds of rates that were unreasonably high. A very similar question was before the Supreme Court in Board of Public Utility Commissioners v. New York Tel. Co., 271 U.S. 23, 46 S.Ct. 363, 366, 70 L.Ed. 808. In that case the company had charged to annual expense an excessive amount for depreciation, which is not different in principle from charging items to expense that should be charged to capital, since in both cases charge to expense is increased and the charge to capital account decreased by the error. In denying a contention that the depreciation reserve thus accumulated, which had been invested in the business, should be used to make up a deficiency in any year when earnings should be less than a reasonable return, the court said:

"Constitutional protection against confiscation does not depend on the source of the money used to purchase the property. It is enough that it is used to render the service. San Joaquin [& Kings River

Canal & Irr.] Co. v. Stanislaus County, 233 U.S. 454, 459, 34 S.Ct. 652, 58 L.Ed. 1041; Gas Light Co. v. Cedar Rapids, 144 Iowa 426, 434, 120 N.W. 966, 48 L.R.A.,N.S., 1025, 138 Am.St.Rep. 299, affirmed 223 U.S. 655, 32 S.Ct. 389, 56 L.Ed. 594; Consolidated Gas Co. v. New York, C.C., 157 F. 849, 858, affirmed 212 U.S. 19, 29 S.Ct. 192, 53 L.Ed. 382, 48 L.R.A.,N.S., 1134, 15 Ann. Cas. 1034; Ames v. Union Pacific Railway Co., C.C., 64 F. 165, 176. The customers are entitled to demand service and the company must comply. The company is entitled to just compensation and, to have the service, the customers must pay for it. The relation between the company and its customers is not that of partners, agent and principal, or trustee and beneficiary. Cf. Fall River Gas Works v. Gas & Electric Light Com'rs, 214 Mass. 529, 538, 102 N.E. 475. The revenue paid by the customers for service belongs to the company. The amount, if any, remaining after paying taxes and operating expenses including the expense of depreciation is the company's compensation for the use of its property. If there is no return, or if the amount is less than a reasonable return, the company must bear the loss. Past losses cannot be used to enhance the value of the property or to support a claim that rates for the future are confiscatory. Galveston Electric Co. v. Galveston, 258 U.S. 388, 395, 42 S. Ct. 351, 66 L.Ed. 678; Georgia Ry. v. R. R. Comm., 262 U.S. 625, 632, 43 S.Ct. 680, 67 L.Ed. 1144. And the law does not require the company to give up for the benefit of future subscribers any part of its accumulations from past operations. Profits of the past cannot be used to sustain confiscatory rates for the future. Newton v. Consolidated Gas Co., 258 U.S. 165, 175, 42 S.Ct. 264, 66 L.Ed. 538; Galveston Electric Co. v. Galveston, supra, page 396 of 258 U.S. [page 355 of 42 S.Ct., 66 L.Ed. 678]; Monroe Gaslight & Fuel Co. v. Michigan Public Utilities Commission, D.C., 292 F. 139, 147; City of Minneapolis v. Rand [8 Cir.], 285 F. 818, 823; Georgia Ry. & Power Co. v. Railroad Commission, D.C., 278 F. 242, 247, affirmed 262 U.S. 625, 43 S.Ct. 680, 67 L.Ed. 1144; Chicago Rys. Co. v. Illinois Commerce Commission, D.C., 277 F. 970, 980; Garden City v. Telephone Company [8 Cir.], 236 F. 693, 696.

"Customers pay for service, not for the property used to render it. Their payments are not contributions to depreciation or other operating expenses or to capital of the company. By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company. Property paid for out of moneys received for service belongs to the company just as does that purchased out of proceeds of its bonds and stock."

See, also, Smith v. Illinois Bell Tel. Co., 282 U.S. 133, 158, 51 S.Ct. 65, 75 L.Ed. 255, and Lindheimer v. Illinois Tel. Co., 292 U. S. 151, 54 S.Ct. 658, 78 L.Ed. 1182.

A question arises as to whether the decision in the Board of Commissioners v. New York Telephone Company, supra, is not in conflict with what was said in Railroad Commission v. Cumberland Tel. & Tel. Co., 212 U.S. 414, 29 S.Ct. 357, 362, 53 L. Ed. 577, quoted from and relied on in the brief of the Commission. If there were such conflict, it would be our duty to follow the decision in the New York Telephone case, as it is the latest expression of the Supreme Court on the matter. But rightly understood, there is no conflict in the decisions. In the Cumberland case the court said, "We are not considering a case where there are surplus earnings after providing for a depreciation fund, and the surplus is invested in extensions and additions".

We have considered the cases of which Natural Gas Co. v. Public Service Commission, 95 W.Va. 557, 121 S.E. 716, may be taken as typical, to the effect that, when a company has had its rates fixed by a public service commission on the basis that certain items represent expense of doing business, it may not thereafter treat the same items as representing capital investment. Without questioning the soundness of these decisions, we think that they have no application here. This is the first proceeding for fixing the interstate rates of the company. A proceeding in West Virginia in the year 1921 fixed intrastate rates; but these related to the comparatively small portion of the company's business done in West Virginia and had no relation to interstate sales. It does not appear, moreover, to what extent, if any, the well drilling costs here under consideration were relied upon as expense of operation in the fixing of those rates, or that the rates charged were higher than they would have been if the costs had been charged to capital and the depreciation thereon charged to expense. It is suggested that the local rates of the East Ohio Gas Co. were based upon the interstate charges of Hope; but there were no proceedings before a utility com-

mission for fixing those rates prior to the time that Hope ceased charging the well drilling items to expense, and it does not appear to what extent, if any, the rates of East Ohio as fixed by municipal ordinances and court proceedings were affected by Hope's expensing of these items.

It should be kept in mind that what the Commission must determine is the value of the company's property, whether the method used be the prudent investment method or some other. If the property were being condemned, no one would suggest that items which went into the cost of producing it should not be considered as a part of its cost, whatever method of accounting it had employed. If it were being sold on the basis of cost, no court would exclude such items from consideration. And there is as little ground for excluding them from consideration in a proceeding like this, where value is being determined as a basis for rates which must compensate the company for the gradual sale of its property through use as well as provide a return upon its investment. Certainly if the company had charged to capital investment items which should have been charged to expense, there would be no excuse for not eliminating them in the valuation of the property; and there is as little excuse for not considering as capital investment items erroneously charged to expense. Bookkeeping which does not reflect realities must not be allowed to obscure the real nature of the inquiry.

## Depreciation.

 It is elementary that, whatever method be adopted for arriving at the valuation of the property, account must be taken of accrued depreciation. The Commission computed accrued depreciation by applying the straight-line service-life method to its properties, i.e. by finding a rate of depreciation based on the average service life of property, multiplying this by the years the property had been in use, and applying this percentage to the book cost of the property. The unit of production method was applied to "plant costs associated with gas supply".[2] Hope offered evidence of the present condition of the property, but this was condemned by the Commission as unreliable, and no consideration was given

to present condition, other than that arrived at by applying the straight-line service-life formula as the measure of depreciation.

Hope contends that the application of the Commission's formula to book cost results in consequences which are inequitable and absurd in the light of existing facts. Thus, it points out that its well equipment having a book cost at the end of 1938 of $7,610,510 was depreciated to $3,222,807, or 42.4% of its cost, whereas the salvage value of such equipment over the past 10 year period has been 65.2%. Field line equipment having a book cost of $7,934,169 was depreciated to $4,088,602, or 51.5%, although the gross salvage value of such material has been 56.7%. Counsel for the Commission challenge the use of the term "salvage value" in connection with this property; but, without going into this controversy, it is sufficient to say that the Commission's method results in a depreciated value which is less than that which the company has accorded similar property under its system of accounting when removed from its wells or lines and held for further use. Other instances of absurd and inequitable consequences resulting from the application of the Commission's formula to book cost are called to our attention; but it is unnecessary to go into them here.

Many of the consequences complained of will be eliminated when the present value of the property is considered in the light of changed price levels and the depreciation percentage is applied to the higher valuations resulting. We think, however, that the Commission may not close its eyes to the actual present condition of the property in determining present value and compute depreciation on the basis of mere formulas, as it has done in this case. The formulas which it has used are undoubtedly important matters for it to take into consideration; but its duty, under the law, is to determine the present fair value of the property, and this cannot be done without consideration being given to its actual physical condition. The point was directly involved in McCardle v. Indianapolis Water Co., 272 U.S. 400, 411, 416, 47 S.Ct. 144, 150, 71 L.Ed. 316. In that case deduction for depreciation based on the sort of for-

---

2 Hope complains also that, in the case of property acquired from other companies which had been taken over by Hope, the Commission deducted the depreciation reserve of those companies from book cost, even though it exceeded straight-line service-life depreciation accrued at the time. In the view that we take of the broader question, however, it is not necessary to go into this.

mulas used here without consideration of the actual condition of the property was disapproved by the Supreme Court, the Court saying:

"There is deducted approximately 25 per cent. of estimate cost new to cover accrued depreciation. The deduction was not based on an inspection of the property. It was the result of a 'straight line' calculation based on age and the estimated or assumed useful life of perishable elements. The commission's report indicates that the property is well-planned, well-maintained, and efficient. Its chief engineer inspected it, and estimated its condition by giving effect to results of the examination and to the age of the property. He deducted about 6 per cent. to cover depreciation. Mr. Hagenah made an estimate of existing depreciation based on actual inspection and a consideration of the probable future life as indicated by the conditions found. He deducted less than 6 per cent. Mr. Elmes testified that he made an inspection and estimate of all the actual depreciation. He estimated $443,044 would be required to restore the property as of appraisal date to its condition when first installed and put in practical operation. He deducted that amount. The testimony of competent valuation engineers who examined the property and made estimates in respect of its condition is to be preferred to mere calculations based on averages and assumed probabilities. The deduction made in the city's estimate cannot be approved."

This was but a restatement of the doctrine laid down in Pacific Gas & Electric Co. v. San Francisco, 265 U.S. 403, 406, 44 S.Ct. 537, 68 L.Ed. 1075, where the court said: "Appellant objects to the application of this method and insists that depreciation should have been ascertained upon full consideration of the definite testimony given by competent experts who examined the structural units, spoke concerning observed conditions and made estimates therefrom. As these examinations were made subsequent to the alleged depreciation for the definite purpose of ascertaining existing facts, we think the criticism is not without merit. Facts shown by reliable evidence were preferable to averages based upon assumed probabilities. When a plant has been conducted with unusual skill, the owner may justly claim the consequent benefits. The problem was to ascertain the probable result of the specified rate, if applied under well-known past conditions, not to forecast the probable outcome of a proposed rate under unknown future conditions."

See, also, Baltimore & O. R. Co. v. United States, 298 U.S. 349, 378, 56 S.Ct. 797, 812, 80 L.Ed. 1209, where it is said "* * * that opinions of experts unsupported by adequate actual tests may not safely be substituted for concrete data."

In dealing with this subject, Bauer & Gold, after analyzing the broad concept of depreciation contained in the case of City of Knoxville v. Knoxville Water Co., 212 U.S. 1, 29 S.Ct. 148, 53 L.Ed. 371, go on to say (Public Utility Valuation for Purposes of Rate Control pp. 218, 219):

"The Court doubtless intended to deal comprehensively with depreciation in the Knoxville case. It declared that due current provisions may be made as an operating cost and that all actual depreciation due to expired service life shall be deducted in the determination of fair value. The amount of deduction, however, was left as a matter of proof to be determined through evidence. Its determination, just as the establishment of reproduction cost new, depends upon affirmative proof. The same applies to every phase of valuation. No item can be included or deducted without valid basis of fact. Determination of reproduction cost new, or the primary valuation however determined, is one process; deduction for depreciation is a second. Each must be based upon facts. Neither can be taken out of the air nor based upon hypothetical or theoretical calculations and analyses."

And as bearing upon the necessity of inspection and the weight to be accorded evidence based thereon, it is said at page 220 of this comprehensive and well considered work:

"Emphasis has been laid upon inspection as against calculation by formula in relation to expired life. The decisions, however, have not rejected the conception that depreciation consists of expired life. They have merely relied upon results of inspection as against abstract calculations of expired life that have not been checked against the realities as determined through physical inspection. While life tables may be important as general guidance, in a particular property or unit the economic life may be much greater or much less than the average presented in a life table. As a calculation based on life tables, expired life of a unit may be 50%,

but in reality it may be only 10% because of special conditions relating to the particular item. Conversely, however, theoretical calculation may show expired life of only 10%, while actual depreciation may be 50%.

"The differences in operating and maintenance conditions are so great between utility properties that inspection is necessary to determine reasonably the ratio of expired to total economic life of the different units. The object of examination is determination of this ratio. This may involve estimates as to remaining and relative expired life. But it would be judgment based upon actual inspection rather than upon mere theoretical calculations without regard to the actualities of the property."

■ Included in accrued depreciation by the Commission were items of $2,107,261 based upon the cost of future abandonment of gas wells and $722,757 upon the cost of future abandonment of other property. Contention is made that, in addition to the error of disregarding the present physical condition of the property in computing depreciation, there was error in adding to depreciation this accrued portion of the cost of future abandonment of property. We cannot agree with this contention. Prior to 1939, the cost of abandonment, it is true, had been charged to expense as it occurred. Under the Commission's system of accounting, however, the company was required to set up a depreciation reserve to provide for future abandonment; and in computing depreciation here, the portion of the depreciation reserve already accrued was added. The principle applied was manifestly correct. The future cost of abandonment constituted a charge against the property, which would have to be met whatever system of accounting was followed; and as the property was used, account should have been taken of this item as well as of investment already made. The cost of abandonment is not a matter which concerns only the last year of use and can therefore be considered an expense of that year. It is a matter which affects the entire cost of the property and must be taken into consideration throughout its entire useful life.

If a well, for example, has cost $10,000 and abandonment cost will amount to $1,-000, the $1,000 as well as the $10,000 must be taken into account in fixing rates and depreciation as the well is used; and, assuming a life of 20 years, it is clear that at the end of 10 years the value consumed through use is not merely $5,000, or half the original investment, but $5,500, or half the total cost including the cost of abandonment. A purchaser at the end of ten years would not be justified in paying more than $4,500 for the well, because the abandonment cost of $1,000 would fall on him, and the use of the well for the remaining ten year period would only be worth a total of $5,500 from which the abandonment cost would have to be paid. (In the illustration, no account is taken, as it should be, of the fact that the abandonment cost is to be incurred in the future and that the present worth of the sums required for abandonment, and not the principal sum, is the amount properly to be considered.) In arriving at the present value of the property, therefore, deduction must be made for the accrued portion of future abandonment cost allocable to the property as well as for depreciation in the investment already made in it, otherwise an inflated valuation will result. In computing the accrued portion, allowance must be made, having in mind the interest bearing quality of money, for the fact that the expenditure is to be made in the future. This is a matter of accounting which it is not necessary to elaborate here. The point is that, in arriving at the present value of the property, it is proper to include in depreciation the accrued portion of future abandonment cost properly computed.

Other Matters Affecting the Rate Base.

■ Capital additions since 1940. The Commission accepted Hope's estimate of fixed capital expenditures for the years 1941, 1942 and 1943, amounting to $8,956,-500. It deducted expenditures in expectation of new or increased business amounting to $1,270,000 and gross property retirements of $2,700,000, making an estimated net change in plant of $4,986,500. From this it deducted estimated net change in depletion and depreciation reserve after elimination of retirement losses chargeable against reserve, and found an estimated increase in net actual legitimate cost over the three year period of $2,784,042. This was divided by two, as the rate order became effective at approximately the middle point of the three year period, or July 15, 1942. The capital addition thus arrived at was $1,392,021. We find no error in this method. Hope complains of the

refusal of the Commission to allow the estimated expenditure of $1,270,000 in expectation of new or increased business; but this was purely a matter of estimate, and we cannot say that the action of the Commission with respect thereto was erroneous or arbitrary.

■ Working capital. The Commission allowed $2,125,000 for working capital. Of this amount $1,228,599 was for material and supplies and is not subject to dispute. $896,401 was for cash working capital. This was arrived at by using 45 days as the lag in the receipt of revenues, and on this basis dividing by eight (as 45 days is the eighth part of a year) annual operating expenses, exclusive of gas purchases, taxes and depreciation expenses. Since the gas which Hope purchases is paid for by its customers before it pays the producers for that gas, and since taxes are paid long after the revenues to which they relate have been collected, we cannot say that there was anything erroneous or arbitrary in eliminating all allowance for gas purchases and taxes from this calculation. Had this been done in Hope's estimate, the result would have been $277,820 less than the amount allowed by the Commission. There is manifestly no error in this connection, therefore, of which Hope can reasonably complain.

## Operating Expenses.

■ Annual depreciation allowance. Hope complains because the Commission, in computing annual depreciation as an operating expense, has applied the rate arrived at by the straight-line service-life method above described to the original book cost of the property and, in addition, has excluded from consideration the items of approximately $17,000,000 representing well drilling costs heretofore charged to expense. It is clear, we think, that annual depreciation must be computed on the basis of the present fair value of the property. The question was before the Supreme Court in United Railways & Electric Co. v. West, 280 U.S. 234, 253, 254, 50 S.Ct. 123, 126, 74 L.Ed. 390, where the court said:

"The allowance for annual depreciation made by the Commission was based upon cost. The Court of Appeals held that this was erroneous and that it should have been based upon present value. *The court's view of the matter was plainly right.* One of the items of expense to be ascertained and deducted is the amount necessary to restore property worn out or impaired, so as continuously to maintain it as nearly as practicable at the same level of efficiency for the public service. The amount set aside periodically for this purpose is the so-called depreciation allowance. *Manifestly, this allowance cannot be limited by the original cost, because, if values have advanced, the allowance is not sufficient to maintain the level of efficiency.* The utility 'is entitled to see that from earnings the value of the property invested is kept unimpaired, so that, at the end of any given term of years, the original investment remains as it was at the beginning.' [City of] Knoxville v. [Knoxville] Water Co., 212 U.S. 1, 13, 14, 29 S.Ct. 148, 152, 53 L.Ed. 371. This naturally calls for expenditures equal to the cost of the worn-out equipment at the time of replacement; and this, for all practical purposes, means present value. *It is the settled rule of this court that the rate base is present value, and it would be wholly illogical to adopt a different rule for depreciation.* As the Supreme Court of Michigan, in Michigan Public Utilities Commission v. Telephone Co., 228 Mich. 658, 666, 200 N.W. 749, 752, has aptly said: 'If the rate base is present fair value, then the depreciation base as to depreciable property is the same thing. There is no principle to sustain a holding that a utility may earn on the present fair value of its property devoted to public service, but that it must accept and the public must pay depreciation on book cost or investment cost, regardless of present fair value. We repeat, the purpose of permitting a depreciation charge is to compensate the utility for property consumed in service, and the duty of the commission, guided by experience in rate making, is to spread this charge fairly over the years of the life of the property.'" (Italics supplied.)

While Mr. Justice Butler in a note to his concurring opinion in Lindheimer v. Illinois Telephone Co., 292 U.S. 151, 176, 54 S.Ct. 658, 78 L.Ed. 1182, stated that the method of computing depreciation there was not in harmony with the principle of the decision in United Railways & Electric Co. v. West, there is nothing to indicate that the court intended to overrule that decision. The question in the Lindheimer case was whether charges to depreciation were not excessive in view of expenditures for current maintenance and the proved condition of the property. The

affirmative answer given to that question by the court lends no support to the position that, in computing depreciation, the present value of the property may be ignored and depreciation be computed by applying to original cost the straight-line formula. In so far as the decision may be said to have any bearing at all upon that question, it supports the contrary position.

In Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 592, 62 S.Ct. 736, 746, 86 L.Ed. 1037, the Supreme Court dealt with an amortization allowance for a "wasting-asset business of limited life". The court said: "We need not now consider whether, as the Government urges, there can in no circumstances be a constitutional requirement that the amortization base be the reproduction value rather than the actual cost of the property devoted to a regulated business. Cf. United Railways [& Electric] Co. v. West, 280 U.S. 234, 265, 50 S.Ct. 123, 130, 74 L. Ed. 390. It is enough that here the business by hypothesis will end in 1954, and that the amortization base, computed at cost and including property already retired, will be completely restored by 1954 by the annual amortization allowances."

■ Here we are dealing not with a "wasting-asset business of limited life", but with an ordinary public utility which is required by law to continue its service to the public. One of the principal reasons for determining the present fair value of its property is that rates may be fixed which will take account of depreciation based on that value in such way as to permit replacements at current prices so às to maintain the level of efficiency. This purpose will be defeated, if depreciation is allowed on the basis of cost, where cost is less than present fair value. It will be defeated too, if a portion of the property used is excluded from the depreciation base. The use of the straight-line service-life method of depreciation, like the prudent investment theory of valuation, has the merit of simplicity and ease of application. It can unquestionably be taken into consideration in arriving at depreciation. The Supreme Court has not yet said, however, that it may be used exclusively in cases where, because of change in price levels, cost does not represent fair present value; and the decision in United Railways & Electric Co. v. West, supra, which has never been overruled, is squarely to the contrary.

In the present state of the law, it would seem clear that, if the present fair value of the property is found to be either greater or less than the original cost of the property less straight-line service-life depreciation, a proper allowance for the difference should be made in computing annual depreciation chargeable as expense. As pointed out by Mr. Justice Stone in his dissenting opinion in United Railways & Electric Co. v. West, supra, however, the question is not a question of law but one of fact for determination by the Commission on all the evidence before it; and, as said in the work on Depreciation by the Staff of the Public Service Commission of Wisconsin (1933) p. 136: "While, as a practical measure, we are convinced that original cost is the proper basis for computing depreciation charges, nevertheless we believe that until the doctrine of the court regarding fair value is changed to prudent investment, it is at least not practical nor plausibly consistent in theory to compute depreciation on any base other than fair value."

■ And we do not think it proper to ignore, as the Commission did, the element of expense attributable to the depreciation of capital added to rate base after 1940. New property used by the company is subject to depreciation as well as old property; and we see no reason why annual depreciation with respect to the additions made to capital between 1940 and the effective date of the rate order should not have been considered as an element of expense.

■ Return from gasoline and butane operations of affiliate. Hope Construction and Refining Company, another Standard Oil subsidiary, extracts gasoline and other by-products from the natural gas produced by Hope. This is in reality a part of Hope's natural gas business, although carried on by an affiliate. The Commission credited to Hope the portion of the profits realized by the affiliate after allowing cost of processing and 6-1/2% return upon net investment. Although this results in crediting to the utility a greater portion of the net profits of the operation of the subsidiary than is ordinarily credited in such cases, we cannot say that the action of the Commission is so arbitrary and unreasonable as to be invalid; and it is well settled that, in the absence of arbi-

trary action resulting in a confiscatory rate, we may not substitute our judgment of what is right and proper for that of the Commission.

 Federal income tax. It is elementary that taxes, including income taxes paid the federal government, are proper elements of expense of operation. The Commission found that $76,579 was a proper amount to allow for federal income tax for the future, although the evidence was that Hope paid $912,313 in federal income tax in 1940. Hope contends that the Commission, in adjudging its 1940 rates to be unreasonable, computed its income tax liability at a figure no greater than that estimated for the future, notwithstanding it had actually paid $912,313 on account of federal income tax in that year. As we have reached the conclusion, as stated more fully hereafter, that the Commission was without power to make findings as to the reasonableness of past rates, except as incidental to fixing rates for the future, we need not determine what allowance should be made for income tax in 1940. So far as rates for the future are concerned, changes in tax laws render irrelevant a discussion of the Commission's figures. In further proceedings to establish rates for Hope, due consideration will doubtless be given to federal income tax liability in estimating necessary expenses of operation, based upon what income tax Hope will be required to pay on income derived from rates found to be reasonable.

 Selection of 1940 as test year. The Commission selected 1940 without regard to the experience of the years immediately prior thereto, as the test year for determining expense of operation in fixing future rates. It is ordinarily unsafe thus to adopt the experience of a single year as a guide. United Gas Public Service Co. v. Texas, 303 U.S. 123, 145, 625, 58 S.Ct. 483, 82 L.Ed. 702; West Ohio Gas Co. v. Public Utilities Com'n, 294 U.S. 79, 81, 55 S.Ct. 324, 79 L.Ed. 773. We do not think that under the peculiar circumstances of the case, however, this action of the Commission can be condemned as arbitrary or unreasonable. The increased demand for gas resulting from war conditions, made the experience of 1940 a safer guide for the future than that of prior years. Hope makes much of the fact that the winter of that year was more than ordinarily severe and that the increased demand for gas resulted in a large percentage of sales representing gas from its own wells, which did not involve payment of the charge required by its contracts on gas purchased from others. The increased demand due to war conditions, however, must necessarily have the same effect, so far as this matter is concerned. The experience of 1940 was the only experience properly comparable. In further proceedings, the experience following 1940 can be added to the experience of that year to form a longer and more dependable test period.

 Other matters affecting operating expenses. Hope's contention as to depreciation and return on distribution properties is sufficiently covered by what we have heretofore said about the necessity of ascertaining present fair value. The contention that $165,963 for drilling a dry well should have been charged to expense in 1940 seems well taken; but the matter can have little bearing in future hearings, as the test period will doubtless cover 1941 as well as 1940 and it will be immaterial which year carries the charge. The amortization of rate case expense over a ten year period seems to be reasonable. It is to be hoped that rate controversies will not be matters of annual occurrence. Driscoll v. Edison Light & Power Co., 307 U.S. 104, 121, 59 S.Ct. 715, 83 L.Ed. 1134.

### Rate of Return.

 The Commission fixed the rate of return at 6½%. There is no controversy as to the rule applicable in determining the rate. "What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to main-

tain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties." Bluefield Water Works & Improvement Co. v. Public Service Com'n, 262 U.S. 679, 692, 43 S.Ct. 675, 67 L.Ed. 1176.

 Under this test we think that the rate of return of 6½% is reasonable. Hope is a well established natural gas company with markets in the industrial regions of Ohio and Pennsylvania protected through its affiliates East Ohio Gas Co. and Peoples Natural Gas Co. As a subsidiary of Standard Oil it has financial advantages that independent utilities do not possess. Cf. Wabash Valley Electric Co. v. Young, 287 U.S. 488, 501, 53 S.Ct. 234, 77 L.Ed. 447. The record shows that profits earned by industrial corporations on invested capital declined from 11.3% in 1929 to 7.5% by 1940. Profits of railroads declined to 3.3% and of utilities to 5.4%. Interest rates are at a low level and rates of return demanded by investors are among the lowest that have ever existed. Securities of natural gas companies were sold at rates between 3% and 6%, with yields on the bulk of bond issues being between 3% and 4½%. Under such circumstances, a finding that 6½% is a reasonable rate of return cannot be disturbed. A like rate of return was approved by the Supreme Court for natural gas companies in Dayton Power & Light Co. v. Public Utilities Com'n, 292 U.S. 290, 311, 54 S.Ct. 647, 78 L.Ed. 1267, and Federal Power Com'n v. Natural Gas Pipeline Co., 315 U.S. 575, 596, 62 S.Ct. 376, 86 L.Ed. 1037.

## Past Rates.

The Commission, while fixing rates to become effective July 1, 1942, found that the rates charged by Hope from June 30, 1939 to that date were unreasonable and unlawful and that the charges to the East Ohio Gas Company were "unjust, unreasonable, excessive and therefore unlawful to the extent of $830,892 during 1939, $3,215,551 during 1940, and $2,815,789 on an annual basis since 1940". It states that it made this finding because the City of Cleveland had raised the question of the lawfulness of the rate charged the East Ohio Gas Company by Hope and had requested that the Commission find the just and reasonable and lawful rate from June 30, 1939 to the date of the Commission's determination "as an aid to state regula-

tion". With respect to its power to take such action, the Commission said:

"The Commission does not have the authority to fix rates for the past and to award reparations. But Congress did empower and instruct the Commission in section 5(a) of the Natural Gas Act to fix future rates, and as a step in that process we must necessarily consider the reasonableness of past and existing rates. When the issue is raised and the public interest will be served, we consider as a necessary part of that duty the power to examine the entire rate problem involved and to determine what rates were lawful in the past. Also, section 14(a) of the Act authorizes the Commission to investigate any facts which it finds necessary in order to determine whether Hope has violated any provision of the Natural Gas Act. Furthermore, the Commission has power to perform any act, pursuant to section 16, which is necessary or appropriate to carry out the provisions of the Act. Under section 4(a) of the Act any interstate wholesale rate that is not just and reasonable is unlawful. Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037. Hope's rate collected from East Ohio Gas Company was lawful after June 21, 1938, the effective date of the Act, only to the extent that it was just and reasonable. The City of Cleveland states that the Ohio Commission is investigating the reasonableness of the East Ohio Gas Company's bonded retail rates in Cleveland for the period since June 30, 1939, and that the lawfulness of Hope's rate is an important factor in the case. Since the enactment of the 1938 Natural Gas Act this Commission has had exclusive jurisdiction to determine the lawfulness of the interstate wholesale rates charged by Hope and other natural gas companies.

"In response to the request of the City of Cleveland, the Commission will make the appropriate findings of fact as to the lawfulness of the rates charged East Ohio by Hope since June 30, 1939. The Interstate Commerce Commission has furnished precedents for the performance of this public duty. Congress intended that this Commission cooperate with State Commissions and municipalities, and the provisions of sections 5(b) and 17 are special evidence of such intent."

 The fundamental difference between quasi-legislative and quasi-judi-

cial power is that the one is concerned primarily with prescribing regulations for the future, the other with determining rights in the light of what has occurred in the past. Cf. Baer Bros. v. Denver & R. G. R. Co., 233 U.S. 479, 486, 34 S.Ct. 641, 58 L.Ed. 1055. The Natural Gas Act shows clearly that it was the intention of Congress to give the Commission quasi-legislative power, i. e. regulatory power as to future rates; but there is no indication of any intention to clothe it with judicial or quasi-judicial powers with respect to past charges or practices, such as was vested in the Interstate Commerce Commission by section 9 of the Interstate Commerce Act. 49 U.S.C.A. § 9. As the Commission itself says, it was not given authority to fix rates for the past or to award reparations on account of past rates. If it was not given the power to fix past rates, or award reparations based upon their unreasonableness, it certainly was given no power to do the same thing indirectly by making findings of fact as to past rates to be given effect in rate proceedings before state commissions. No intention on the part of Congress to vest any such unusual power in a commission ought to be indulged unless conferred in the plainest terms; and not only is it not plainly given here, but such power cannot be spelled out of the statutes on any theory of interpretation with which we are familiar.

Section 4(a) of the Natural Gas Act, to which the Commission refers in its opinion, merely provides that rates shall be "just and reasonable" and declares unlawful a rate that is not "just and reasonable". Section 14(a) provides for nothing except investigations by the Commission to determine whether or not the act is being violated. The only power with respect to fixing rates is that contained in section 5 (a) heretofore quoted, which is confined to prescribing rates for the future. Section 16, to which the Commission refers, merely clothes the Commission with power to perform all acts etc. necessary or appropriate to carry out the provisions of the Act. Certainly no power to make findings as to past rates is contained there. Section 5(b) authorizes the Commission, upon its own motion or upon request of a state commission, to investigate and determine the cost of production or transportation of natural gas, not to fix past rates or to do the same thing indirectly by determining

that amounts collected in the past exceeded reasonable rates. Section 17 does no more than authorize the Commission to refer any matter arising in the administration of the act to a board, members of which are to be nominated by state commissions, and to authorize the Commission to confer with state commissions and hold joint hearings with them in connection with any matter "with respect to which the Commission is authorized to act", and to authorize the Commission, in the administration of the act, to avail itself of the cooperation, services etc. of state commissions.

In none of these sections is any power granted to make findings as to reasonableness of past rates "as an aid to state regulation"; and in all of them taken together and construed in the light most favorable to the existence of the power, there is no indication of any intention on the part of Congress to grant such power. We cannot escape the conclusion that, if it had been the intent of Congress to grant unusual power of this sort, it would have said so plainly. Instead of saying so, however, Congress clearly limited the power of the Commission to that of fixing rates for the future by the following provision of section 5(a): "The Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract *to be thereafter observed and in force*, and shall fix the same by order". (Italics supplied.) It is to be noted that in the passage of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq., upon which the Natural Gas Act is modeled, provisions giving the Commission power to investigate single rates and issue reparation orders, originally incorporated in the bill, were stricken out, the Senate Committee saying in its report: "They are appropriate sections for a state utility law, but the committee does not consider them applicable to one governing merely wholesale transactions". The Commission may not by administrative interpretation of the act thus clothe itself with a power denied it by Congress. As was said by Mr. Chief Justice Groner in Chenery Corp. v. Securities and Exchange Com'n, 75 U.S.App.D. C. 374, 128 F.2d 303, 311:

"In expressing this opinion, we are not saying that the Commission's view is not directed to a desirable end. As to that, opinions of men of experience and probity

and judgment will differ widely. But, if the Commission's objective is to be attained, it should be only after the pros and cons have been carefully weighed in their relation, respectively, to the dangers and the benefits, and the scales should be controlled by Congress and not by the Commission. In short, all that we hold is that this vital question of policy is one for the Congress and not for the Commission."

When rates were filed with the Commission pursuant to section 4(c) of the Act they became the only lawful rates which the utility could charge or accept. Cf. Louisville & N. R. Co. v. Maxwell, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853, L.R.A.1915E, 665. Until changed by the Commission under the power granted pursuant to section 5(a) they were binding alike upon the company and its customers; and, in the absence of a provision for award of reparation, there could be no occasion for a determination of their reasonableness except as reason for changing them in an order prescribing rates for the future. The suggestion in the Commission's brief that exercise of power as to past rates is necessary to obviate injustices resulting from delay in rate proceedings lacks force in view of the provision of the statute for the entry of interim orders. § 16. Cf. Federal Power Com'n v. Natural Gas Pipeline Co., 315 U.S. 575, 583, 62 S.Ct. 736, 86 L.Ed. 1037.

As a step in the process of fixing rates for the future, it was of course proper for the Commission to make findings with respect to the conditions and rates of the past, and we shall construe the findings as made pursuant to that power, and as subject to review like other findings made in support of the order. When so considered, they are invalidated by the same errors that vitiate the findings upon which the order fixing rates for the future is directly based.

It is argued that we are without power to review the findings as to past rates because no order is based thereon; but, as stated above, they are reviewable because made as a step in the proceeding to fix rates for the future. If, however, they be considered separate and apart from this and it be thought, contrary to our view, that the Commission has power to make such findings as to past rates "as an aid to state regulation", we think, nevertheless, that there can be no question as to their being reviewable under the statute. Such determination in that case would be, in effect, an order of the Commission affecting substantial rights and contractual relationships of a party to a proceeding before it and would be reviewable as such, whatever it might be called. Columbia Broadcasting System v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L. Ed. 1563; Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147. As said by Mr. Chief Justice Stone in the Columbia Broadcasting case, supra, with respect to whether particular action by the Commission constituted a reviewable order: "The particular label placed upon it by the Commission is not necessarily conclusive, for it is the substance of what the Commission has purported to do and has done which is decisive. Powell v. United States, 300 U.S. 276, 284, 285, 57 S.Ct. 470, 474, 475, 81 L. Ed. 643; American Federation of Labor v. National Labor Relations Board, 308 U.S. 401, 408, 60 S.Ct. 300, 303, 84 L.Ed. 347." [316 U.S. 407, 62 S.Ct. 1200, 86 L. Ed. 1563.] And as said by Mr. Justice Frankfurter in his dissenting opinion in that case: "If an administrative determination of status has the effect of subjecting a person to legal obligations, whether embodied in statute or previously formulated administrative commands, or otherwise affecting legal rights, such a determination possesses the elements of a reviewable order." A finding by the Commission which determines that past rates are unlawful in a determined amount, and which is to be given effect by a state regulatory body in determining the reasonableness of rates charged on the basis thereof, certainly affects legal rights; and the power of review under the statute should be coextensive with the power of the Commission to make such determination.

In any view of the matter, therefore, the findings as to past rates are reviewable, and should be set aside for the reasons heretofore given in discussing valuation and depreciation. We are impressed, also, with the thought that the finding as to unreasonableness of these rates cannot be sustained because made on the basis of the utility's experience during the years in question, instead of upon a reasonable estimate of expense based upon experience of a prior period. The reasonableness of a rate must be judged in the light of information available at the time

312

it is charged, not in the light of subsequent developments. It is manifestly impractical to conduct a wholesale natural gas business on the basis of annual changes in rates; and certainly it is unreasonable that rates be condemned retroactively on the basis of facts which could not have been known when they were charged.

For the reasons stated, the order of the Commission will be set aside and the cause will be remanded for further proceedings.

Reversed and remanded.

DOBIE, Circuit Judge (dissenting).

I regret that I must dissent from the majority opinion. The importance of this case, and the wide interest in the vital questions involved, prompt me to set out, very briefly, the reasons for my dissent.

Under the majority opinion, the decision of the Federal Power Commission is reversed on three principal grounds: (1) The adoption by the Commission of the Prudent Investment Theory in fixing the rate-base; (2) The use by the Commission of the Economic Service Life Method in arriving at depreciation; (3) The refusal by the Commission to allow as capital outlay the well-drilling costs which Hope had previously charged to operating expenses.

(1) The Prudent Investment Theory.

The Commission, in arriving at the proper rate-base, frankly and openly adopted the Prudent Investment Theory and paid no attention to the present value of the properties of Hope. Mr. Justice Brandeis, in his classic concurring opinion (Mr. Justice Holmes joined in the opinion) in State of Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission of Missouri, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981, 31 A.L.R. 807, has set forth, with his customary incisive clarity, the Prudent Investment Theory, together with the reasons for his belief in that theory. To my mind, the arguments he therein advances have never been convincingly refuted.

Nearly twenty years have slipped by since that opinion was handed down. During this period, the pronouncements of the United States Supreme Court in this field have been many, varied and quite confusing. This fact has been pointed out by writers whose names are thrice legion. The recent case (involving the Natural Gas Act, with which we are also concerned) of Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037, however, does call for some comment.

The majority opinion in that case (written by Chief Justice Stone) contains no express discussion of the Prudent Investment Theory and certainly does not in precise terms sanction the use of that theory alone. Interesting, though, in this connection is the oft-quoted statement of Chief Justice Stone (315 U.S. at page 586, 62 S.Ct. at page 743, 86 L.Ed. 1037):

"The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end."

But the concurring opinion of Justices Black, Douglas and Murphy, on the specific point under discussion, is as clear as crystal and as crisp as bacon; for this opinion flatly and squarely upholds the validity of the application of the Prudent Investment Theory, to the exclusion of any other theory (315 U.S. at page 606, 62 S. Ct. 752, 86 L.Ed. 1037) in three sentences so free from ambiguity that they cannot be misunderstood:

"As we read the opinion of the Court, the Commission is now freed from the compulsion of admitting evidence on reproduction cost or of giving any weight to that element of 'fair value'. The Commission may now adopt, if it chooses, prudent investment as a rate base—the base long advocated by Mr. Justice Brandeis. And for the reasons stated by Mr. Justice Brandeis in the Southwestern Bell Telephone case, there *could be no constitutional objection if the Commission adhered to that formula and rejected all others."* (Italics ours.)

It is difficult for me to believe that the majority of the Supreme Court, believing otherwise, would leave such a statement unchallenged.

A careful study of the Natural Gas Act (particularly the precise wording of Section 6) convinces me that Congress intended to give to the Federal Power Commission a wider latitude and a more extended discretion than had been given to any other federal board or commission under any previous statute in the field of rate making.

Further, I think that the methods adopted by the Commission under the Prudent Investment Theory, in arriving at a rate-base in the instant case, were neither fanciful nor arbitrary. It seems to me, too, that there was substantial evidence to support the opposite findings of the Commission.

Accordingly, I see here no adequate reasons for reversing on this score the decision and findings of the Commission.

(2) The Economic Life Service Method of Computing Depreciation.

In computing depreciation and depletion, the Commission employed the Economic Life Service Method. This formula has long been known to, and has been frequently applied by, economists and accountants. It seems to have been often used in connection with depreciation under the federal income tax. I cannot find in this formula any active germs of constitutional invalidity, as it is applied to the instant case.

The Commission based its determination of existing depletion and depreciation upon actual legitimate cost of the properties of Hope. An apparently competent engineer inspected this property to obtain information that would serve as a guide for estimating the property's service life and the amount of money required annually to reimburse Hope for so much of this property as might be consumed in rendering service to the public.

Incidentally, the amount deducted by the Commission fell short by many millions of dollars of the amount accrued and set up by Hope for depreciation and depletion. In his partially dissenting opinion, Commissioner Scott expressed the view that the Commission had been, in fixing the amount for depreciation and depletion, far too lenient with Hope.

Again I feel that there was substantial evidence to sustain the Commission's findings under a formula which was neither unrealistic nor capricious.

(3) Disregard of Drilling Costs Charged by Hope to Operating Expenses.

The Commission refused to allow as capital the amount of drilling cost which Hope had in the past charged to operating expenses. The Commission found (and I think this finding is supported by the evidence) that these costs had been considered by Hope in fixing its rates in previous years and that these costs had already been paid by the consumers. On this ground, the Commission declined to include these costs in arriving at the rate-base.

It was the practice of Hope, prior to 1923, to charge well-drilling costs to operating expenses rather than to capital account. In so doing, Hope seems to have followed the then general procedure of the natural gas industry. It changed this practice under a requirement of the Public Service Commission of West Virginia. The present system of accounting prescribed by the Federal Power Commission also follows the West Virginia practice. It is my considered opinion that the present procedure is the proper one.

It is to be noted that this is not a mere mathematical error in book-keeping, which of course, should be corrected. It is rather an accounting policy. It does not seem to me to be vital whether the decision of the Commission here is based upon technical estoppel, equity or fair dealing. And once more, I think the Commission should be here sustained. Under its present claim, Hope seeks to impeach its books, which were competently kept for a long period of years under the older method. And Hope itself, in a previous rate case before the Public Service Commission of West Virginia, claimed these well-drilling costs as operating expenses, its contention was allowed, and its rates were fixed accordingly.

The holding of the Commission here is sustained by the great weight of authority. In the Commission's brief, these authorities are set out at great length, and include decisions of federal courts, decisions of state courts, and decisions of State Utility Commissions. Quite striking here, I think, is an extract from the majority opinion in the recent Natural Pipe Line case, 315 U. S. at pages 590, 591, 62 S.Ct. at page 745, 86 L.Ed. 1037:

"Here the companies, though unregulated, always treated their entire original investment, together with subsequent addi-

tions, as capital on which profit was to be earned. They charged the out-of-pocket cost of maintenance of plant, whether used to capacity or not, as operating expenses deductible from earnings before arriving at net profits. *They have thus treated the items now sought to be capitalized in the rate base as operating expenses to be compensated from earnings, as in the case of regulated companies.* * * * *We cannot say that the Commission has deprived the companies of their property by refusing to permit them to earn for the future a fair return and amortization on the costs of maintenance of initial excess capacity— costs which the companies fail to show have not already been recouped from earnings before computing the substantial 'net profits' earned during the first seven years.*" (Italics ours.)

For the reasons stated, I think the decision and findings of the Commission should be affirmed.